# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OFWASHINGTON, | No. 57482-9-II |
| Respondent, | |
| v. | |
| LYNN M. CHEROFF, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Lynn Cheroff appeals her convictions for one count of drive-by shooting and one count of rendering criminal assistance. First, she alleges the State failed to present sufficient evidence establishing accomplice liability for the crime of a drive-by shooting. Second, she argues that defense counsel was ineffective when they stipulated to the admission of Matthew Ashby's statements to police in violation of her right to confrontation; failed to offer further clarity to the jury's question regarding instruction seven; and stipulated to the calculation of her offender score, which included an allegedly non-comparable out-of-state conviction. Third, Cheroff argues that the trial court lacked authority to consider an out-of-state conviction when imposing her sentence and violated her constitutional rights. Last, Cheroff argues that certain community custody conditions and the crime victim penalty assessment (CVPA) should be stricken.

We conclude that (1) sufficient evidence supports Cheroff's conviction for drive-by shooting, (2) Cheroff fails to show defense counsel was deficient, (3) the court did not err in accepting the parties' stipulation as to her offender score and Cheroff's waiver of comparability determination by the court, and (4) the challenged community custody conditions and the CVPA should be stricken from the judgment and sentence. Accordingly, we affirm Cheroff's convictions but remand to the trial court to strike the challenged community custody conditions and the CVPA.

## FACTS

### I. THE INCIDENT

On December 19, 2021, Olympia police officers were dispatched to The Home Depot after a report that shots were fired. While on route, dispatch shared that one of the involved vehicles, a white Toyota Tacoma (Toyota) was still in the vicinity. Dispatch also relayed that a large dark-colored truck, which was also involved, left at a high rate of speed and that another vehicle, a BMW sedan, was also involved.

Officer Kory Pearce was the first to arrive on the scene. Officer Austin Hansen soon joined him. Pearce testified that he spoke with the person inside the Toyota, who was identified as Cheroff. Cheroff sat in the Toyota with the door open. She was shaking while trying to light a cigarette. Pearce said Cheroff declined medical aid, but he saw that her Toyota had sustained collision damage.

Cheroff told Pearce that she had gone to The Home Depot to drop off a friend, Tara, who needed to do some shopping, but Cheroff opted to wait in her Toyota because she was wearing pajamas. Pearce later testified that on the day of the incident, Cheroff was wearing leggings.

Cheroff relayed to Pearce that she was parked and waiting when she heard gunshots. Her Toyota was then hit by another vehicle while it raced from the parking lot. As a result, Pearce noted he did not suspect Cheroff of involvement in the shooting but recorded her contact information anyway.

Both Pearce and Hansen observed numerous shell casings near the Toyota, with one casing lodged in the Toyota's tire tread, and Hansen found a cell phone in the parking lot near the passenger side of the Toyota. Hansen also saw Cheroff talking to a large, bald, white male, not a woman. Additional facts around Cheroff's conduct during the incident were presented at trial and are discussed below.

The State charged Cheroff with one count of a drive-by shooting and one count of rendering criminal assistance in the second degree stemming from a December 19, 2021 incident. Cheroff exercised her right to a trial by jury.

II    PRE-TRIAL MOTIONS

Cheroff filed a motion in limine to exclude statements made by an alleged codefendant, Ashby. Ashby had reported the blue Chevy Colorado (Chevy) stolen, and had told police in an interview that Cheroff offered to recover the Chevy in exchange for payment. Ashby also made several statements via text message that had been retrieved from the cell phone found at the scene.

Cheroff's motion sought to exclude any statements Ashby made to police and any text messages he sent as hearsay and overly prejudicial. Cheroff did not raise an issue with Ashby's report of the blue Chevy as stolen. However, Cheroff sought to exclude Ashby's statements regarding her offer to recover the Chevy in exchange for payment. Cheroff argued the statement was hearsay, and that admission would violate her right to confrontation. In the alternative, Cheroff argued that if any or all of Ashby's statements were admitted, they should be limited to

3

what is relevant to the case. Finally, Cheroff argued that the text messages sent by Ashby that were extracted from the cell phone report were hearsay, overly prejudicial, and speculative.

In response to Cheroff's motion, the State agreed that the statements made by Ashby to the police after being brought in for questioning in January[1] were not in furtherance of the conspiracy, were hearsay, and should be excluded. However, the State argued that the statements made on December 19 and 20, the day of and the day after the incident, were not hearsay and therefore not subject to confrontation. Eventually, the State and Cheroff agreed "that the statements made by Matthew Ashby [when brought in for questioning] in January" would be excluded. Rep. of Proc. (RP) (Sept. 13, 2022) at 221. The parties also agreed that

> [t]he statements made by Matthew Ashby that took place on December 1[9]th which occurred about 3 o'clock in the afternoon when he reported the vehicle stolen, and the statements made on the 20th when he reported the vehicle recovered, should be entered as they are in furtherance of the criminal conspiracy.

RP (Sept. 13, 2022) at 222.

---

[1] Ashby stated to police that he had made a deal with Cheroff and her boyfriend to pay them $5,000 upfront and $5,000 after helping him return the Chevy by "any means necessary." Clerk's Papers (CP) at 2. Ashby denied ever being at The Home Depot the day of the incident and explained that his phone was recovered at the scene because "Jacob" had stolen it. CP at 2. However, Ashby changed his story later, stating that he loaned his phone to Cheroff's boyfriend to communicate with him once they retrieved the truck. Ashby added that Cheroff and her boyfriend "told him his truck was at The Red Wind Casino and they would meet him there to trade the truck for the money." CP at 2. Ashby then said, "the next day he didn't know what to do about the truck, so he took it to the Nisqually Pub and dropped it off." CP at 2. He then created a fake text account under Jacobs's name, and texted himself, noting the truck would be at the Nisqually Bar and Grill. All of those statements were not admitted or considered as police realized they were false statements, and the State stipulated that they were inadmissible as they were not made in the furtherance of the conspiracy.

III    TRIAL

A jury trial was held. Officers Pearce, Hansen, Kelsey Schmidt, deputies Wayde Sandoval and Andrew Wilkie, and detectives Patrick Hutnick and Josh Marcuson testified.[2]

A.    Testimony

Pearce testified at trial consistently with the above. Hansen also testified. Hansen testified that the cell phone he saw at the scene near the Toyota received a call and a text message immediately after the shooting. The text message read, "one of u dropped your fuking cellphone." Ex. 9. The call and text were from Cheroff.

Sandoval testified that he was on patrol when, a couple of hours after the shooting, he received a dispatch call reporting an auto theft. He responded to Ashby's apartment. Ashby reported that his blue rented Chevy truck was stolen by his cousin Jacob Ashby[3] earlier that day. Ashby reported that Jacob stole his cell phone as well.

Later, still on the day of the shooting, Sandoval was on patrol near Ashby's apartment and saw a white Toyota truck with a broken taillight. He saw someone seated in the passenger side with the door open, but it was too dark for Sandoval to make out who the person was. Sandoval recorded the license plate number of the Toyota truck.

The next day, Sandoval learned that there was a white Toyota truck with a broken taillight involved in The Home Depot incident. He reviewed the Olympia Police Department report on The Home Depot incident. He discovered that the license plate number for a vehicle belonging to

---

[2] Ashby pled guilty to assault in the second degree and was sentenced to 13 months pursuant to a *Barr* plea on August 4, 2022. *In re Pers. Restraint of Barr*, 102 Wn.2d 265, 684 P.2d 712 (1984). He did not testify at Cheroff's trial.

[3] Due to Matthew and Jacob having the same last name, we will refer to Jacob Ashby by his first name. No disrespect is intended.

one of the witnesses, matched the plate number of the white Toyota truck with the broken taillight that he had observed on the night of the shooting.

Sandoval e-mailed Wilkie and requested Wilkie obtain information on the vehicle that Ashby had reported stolen. They learned it was a blue 2021 Chevrolet Colorado. Ashby called Wilkie and reported that he knew the location of the Chevy. Ashby told Wilkie he received a text from Jacob that the truck had been dropped off at Nisqually Bar and Grill. Wilkie went to Nisqually Bar and Grill and found the Chevy truck. Wilkie called Ashby. Wilkie then examined the Chevy. Upon inspection, he noticed several fresh bullet holes and scrapes. Wilkie noted that one bullet struck mere inches from where the driver would sit. The Chevy was then returned to Ashby.

Hutnick was next to testify. He stated he was briefed by his sergeant about investigating the incident. He was alerted to the cell phone left at the scene, for which he then obtained a warrant and submitted the cell phone to Marcuson for forensic examination. Marcuson created a report that showed "a lot of contact" between Cheroff and Ashby. RP (Sept. 13, 2022) at 354.

Hutnick also testified that Marcuson's report showed a picture of Ashby and contact information for Cheroff that caught his attention. He had spoken with Sandoval and learned that Ashby had reported the Chevy stolen and that the stolen Chevy matched the description of the vehicle involved in The Home Depot shooting. Hutnick said there were several communications on the day of the shooting between Cheroff and Ashby on the phone report, totaling 15 different phone calls. One call in particular, lasting seven minutes, occurred around the same time as the incident.

6

Hutnick testified that he spoke with Cheroff. Cheroff initially told Hutnick that she was a victim of circumstance and had no knowledge of anyone involved or anything that happened. However, Cheroff then stated she had knowledge that Ashby had his Chevy stolen by Jacob, who was going to be at The Home Depot, and that she was going to get the Chevy back for Ashby. Cheroff volunteered that when the "shooting happened, she backed up first because she had more truck, instead of going forward." RP (Sept. 13, 2022) at 365.

The surveillance video from The Home Depot admitted at trial showed the Toyota enter The Home Depot parking lot. The Chevy, was backed into a stall and a dark sedan was parked behind the Chevy. The Toyota proceeded to back into a position where it was blocking the front end of the Chevy. The doors of the sedan opened, and two men ran toward the Chevy and began shooting. The Chevy moved forward, the Toyota backed up, blocking the Chevy. At about that time, the shooters returned to the sedan and departed. Eventually, the Chevy maneuvered around the Toyota and departed. The Toyota then parked where the Chevy had been and did not leave the scene.

B.      Jury Question

During deliberations, the jury submitted a question that read as follows: "Re: Instruction No. 7 does 'The crime' indicate that she had prior knowledge of specific drive by shooting crime or a crime in general?" Clerk's Papers (CP) at 52. In response, the trial court asked the attorneys how they wanted to answer. The court stated it had already noted and determined what law applies via the jury instructions given, which were agreed to by the parties prior to jury deliberation. Both attorneys agreed that the proper response to the question was to refer to their jury instructions and "see what happens next." RP (Sept. 13, 2022) at 65.

C.    Sentencing

The jury found Cheroff guilty on both counts.  Cheroff filed a sentencing memorandum, noting that "Cheroff's criminal history indicates convictions out of the state of Texas, and that [Cheroff] may have 9+ points for sentencing purposes," as well as "[i]f Ms. Cheroff's criminal score is 9+ points, her range is 87-116 months on the Drive By Shooting conviction."  CP at 79-80.  Cheroff and her counsel also signed the prosecutor's statement of criminal history.  The statement assigned felony points to a 2009 Texas aggravated assault that was sentenced in 2013, noting it is "legally comparable to Assault 2nd Degree."  CP at 128.  Above Cheroff and her counsel's signature is the statement, "[t]he defendant and the defendant's attorney hereby stipulate that the above is a correct statement of the defendant's criminal history relevant to the determination of the defendant's offender score in the above-entitled case."  CP at 129.

The State's sentencing memorandum listed four Texas convictions.  Consequently, the State recommended 101.5 months for count I and 182 days for count II, and 18 months of community custody.  The State also recommended the $500 CVPA.  A week later, the State amended its sentencing memorandum to list only three Texas convictions, including the aggravated assault that was committed in 2009 but sentenced in 2013.  The first sentencing memorandum listed the aggravated assault as "Legally Comparable to Assault 2," while the amended sentencing memorandum had, "Certified Judgment Not Received."  CP at 84, 88.[4]

During the sentencing hearing, the court asked whether defense counsel agreed to the State's criminal history, to which counsel stated, "I agree, Your Honor.  I have had a chance to review it."  RP (Oct. 18, 2022) at 5.

---

[4] The aggravated assault offense was committed on August 6, 2009 but was sentenced on July 31, 2013.

The trial court accepted defense counsel's agreement to the offender score and imposed an 87-month sentence, which was within the standard sentencing range for an offender score of 9.

The judgment and sentence included two Texas crimes, listing Cheroff's offender score at 9. The judgment and sentence also imposed 87 months of confinement, with 18 months of community custody, and a $500 CVPA, but waived community custody supervision fees due to indigency. All attorneys and Cheroff signed the judgment and sentence. Notably, the judgment and sentence contained a list of Cheroff's criminal history much like the State's statement of criminal history in its amended sentencing memorandum. The description of the 2009 Texas aggravated assault that was sentenced in 2013 read, "Certified Judgment Not Received." CP at 93.

Cheroff appeals her conviction and sentence.

IV. CHEROFF'S POST-CONSIDERATION MOTION

On June 21, 2024, the United States Supreme Court decided *Erlinger v. United States*, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024). Pursuant to *Erlinger*, Cheroff filed a post-consideration motion, arguing the trial court violated her rights protected by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution as well as article I, section 22 of the Washington State Constitution by considering the Texas conviction and increasing her punishment without a jury determination of the fact of conviction.

ANALYSIS

I. SUFFICIENCY OF THE EVIDENCE PROVING ACCOMPLICE LIABILITY

Cheroff argues there was insufficient evidence establishing accomplice liability because she did not knowingly facilitate a drive-by shooting, and instead, was a victim of the offense. We disagree.

We review challenges to the sufficiency of the evidence by considering whether any rational trier of fact, in viewing the evidence in the light most favorable to the State, could find the essential elements of the crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Circumstantial and direct evidence are equally reliable in determining whether the evidence was sufficient. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). Nonetheless, inferences based on circumstantial evidence must be reasonable and not based on speculation. *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

We review a claim of insufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

A person is an accomplice to a crime if, "[w]ith knowledge that it will promote or facilitate the commission of *the* crime," they aid another person in planning or committing the crime. RCW 9A.08.020(3) (emphasis added). However, "a person is not an accomplice in a crime committed by another person if . . . [h]e or she is a victim of that crime." RCW 9A.08.020(5)(a).

The "word 'aid' means all assistance whether given by words, acts, encouragement, support, or presence." *State v. Dreewes*, 192 Wn.2d 812, 822, 432 P.3d 795 (2019). The State must prove the defendant knew they were promoting or facilitating the principal in the commission of the crime to meet its burden on accomplice liability. *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). However, the State may prove the defendant's knowledge through circumstantial evidence. *Id.*. The "'State need not prove that the principal and accomplice share the same mental

10

state.'" *Dreewes*, 192 Wn.2d at 824-25 (internal quotation marks omitted) (quoting *State v. Guloy*, 104 Wn.2d 412, 431, 705 P.2d 925 (1984)).

Here, Cheroff's argument is unpersuasive. In viewing the evidence in the light most favorable to the State, there is sufficient evidence showing that Cheroff aided Ashby in committing the drive-by shooting. First, video evidence shows that Cheroff, driving her Toyota, entered The Home Depot parking lot while a dark sedan waited in the next aisle over from the subject Chevy. At least two figures are then seen stepping out of the sedan and shooting toward the Chevy. Cheroff's Toyota then backs up and blocks the Chevy from leaving. After the Chevy and sedan eventually left, Cheroff parked her Toyota. Consequently, Cheroff's piloting of the Toyota as it proceeded to stop in front of the Chevy, and her repositioning of it while the Chevy tried to leave, leads to a reasonable inference that she played an active part in preventing Jacob's escape from the shooting.

Further, testimony from Hutnick highlighted that there were 15 phone calls that day between Cheroff and Ashby, with a seven-minute phone call *during* the shooting. The reasonable inference is that Cheroff and Ashby were coordinating their efforts, which clearly meets the definition of "aiding" in the accomplice instruction. Hansen also testified that the cell phone left at the scene received a call and a text message from Cheroff saying, "one of u dropped your fuking cellphone." Ex. 9. The inference is that Cheroff knew exactly who she was texting: the two shooters. The jury can infer from the text that she is lamenting the existence of significant evidence that would tie one of the text recipients to the phone and therefore the shooting, and eventually lead to all participants being found out.

11

Additionally, when Cheroff was questioned by Hutnick, Cheroff said she knew Ashby's Chevy was stolen by Jacob and that Jacob would be at The Home Depot, so she was going to get the Chevy back for Ashby. Considering this statement in the light most favorable to the State leads to the conclusion that in getting the Chevy back, Cheroff was speaking of doing so via the shooting incident.

Moreover, Pearce testified that Cheroff initially stated she had gone to The Home Depot parking lot, not with Ashby but with her friend Tara, and dropped Tara off so she could do some shopping. Cheroff said she did not go in the store because she was wearing pajamas, so she parked and waited.

It was not until later in her conversation with Pearce that Cheroff reported hearing gunshots and her truck being hit by the Chevy. This suggests, and the jury could reasonably infer, that Cheroff was distancing herself from Ashby because she had knowledge of his plan to set up Jacob for the shooting as a way of retrieving the Chevy. Aside from the change in her story, Cheroff was seen on the day of the incident talking to a large, bald, white male, not a woman.

Finally, Cheroff argues that she was a victim of the shooting and cannot also be a participant. Cheroff's argument fails. A "victim" is "a person who suffers injury as a direct result of a crime." *City of Auburn v. Hedlund*, 165 Wn.2d 645, 651, 653, 201 P.3d 315 (2009). Cheroff argues she suffered injury from the drive-by shooting due to her car being in the line of fire, which was supported by police finding shell casings just east of her Toyota and in the tread of her tire. We do not contest that she was in the line of fire but for all the reasons mentioned above, when construing the evidence in a light most favorable to the State, a rational trier of fact could infer that Cheroff acted as an accomplice beyond a reasonable doubt and was not a victim of the drive-by shooting.

II.   INEFFECTIVE ASSISTANCE OF COUNSEL

We review claims of ineffective assistance of counsel de novo. *State v. Stotts*, 26 Wn. App. 2d 154, 162, 165, 527 P.3d 842 (2023). "Criminal defendants have a constitutional right to effective assistance of counsel." *Id.* at 164; *see* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Courts begin with the presumption that counsel's performance was effective. *Stotts*, 26 Wn. App. 2d at 165. Therefore, a defendant must demonstrate from the record that there was "'no legitimate strategic or tactical reason for counsel's action.'" *State v. Putman*, 21 Wn. App. 2d 36, 55, 504 P.3d 868 (2022) (quoting *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009)); *Stotts*, 26 Wn. App. 2d at 165.

"'To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Stotts*, 26 Wn. App. 2d at 165 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Both prongs must be met to prevail on claims of ineffective assistance. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

A.      Stipulation to Admission of Ashby's Statements to Police

Cheroff asserts that her counsel was deficient in stipulating to the admission of (1) Ashby's December 19 statement reporting his Chevy and cell phone stolen and (2) Ashby's statement to police that he received a text message from Jacob on December 20 informing him the Chevy was at Nisqually Bar and Grill. Cheroff reasons that these statements were testimonial and barred under the confrontation clause because Ashby did not testify at trial.

The State argues that this stipulation by Cheroff's counsel was a strategic choice made in exchange for the prosecutor's agreement to not seek admission of other statements. The State further asserts that even if counsel had not stipulated to the admission, the statements would not be barred as they are made by a co-conspirator in the furtherance of a conspiracy or are admissible as background or context, rather than to prove the truth of the matter asserted. Finally, the State argues that admission of the statements actually furthered defense's theory of the case that Ashby talked to Cheroff about trying to get the Chevy back and Cheroff did not know that Ashby would engage in a shooting to facilitate his goal.

Here, the record is insufficient to overcome the strong presumption that counsel's conduct was reasonable. There is no record of what other potential statements would have been sought to be admitted by the prosecution as the discussion and agreement between the parties occurred off the record, as our record contains only those statements that *were* admitted. As a consequence, we cannot know whether the decision counsel made was strategic or not. Cheroff failed to provide a record sufficient to allow review of this issue. However, Cheroff may choose to file a personal restraint petition to "raise issues on appeal that require evidence of facts or facts not in the existing record." *See McFarland*, 127 Wn.2d at 335.

B.      Jury Instruction Clarification

Next, Cheroff argues that her counsel's failure to offer a clarifying jury instruction to the jury's question regarding the law of accomplice liability resulted in juror confusion. Consequently, Cheroff asserts that she was prejudiced because there was a reasonable possibility that the jury would not have convicted her had their confusion regarding accomplice liability been cleared up.

The State counters, relying on *State v. Miller*, 40 Wn. App. 483, 698 P.2d 1123 (1985), that a jury asking a question does not create an inference that either the entire jury was confused or that any confusion was not clarified before the jury reached its verdict. Further, the State points out that Cheroff is unable to show counsel was deficient or that she was prejudiced because all parties, including the court, agreed that referring the jurors back to the jury instruction properly answered the question posed before the verdict was reached.[5] We agree with the State on its first argument: the jury question did not create an inference that the jury was confused. Moreover, the instructions were accurate and the jury question did not create a need for defense counsel to insist on a clarifying instruction.

Here, the jury asked, "Re: Instruction No. 7, does, 'the crime' indicate that she had prior knowledge of specific drive by shooting crime or a crime in general?" CP at 52.

Instruction 7 clearly refers to "the crime":

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of *the crime*.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission *of the crime*, he or she either solicits, commands, encourages, or requests another person to commit *the crime*; or aids or agrees to aid another person in planning or committing *the crime*.

CP at 66 (emphasis added). Pointedly, Cheroff concedes that the jury instruction is legally correct and not a misstatement of the law. We conclude the instruction clearly addressed the question raised by the jury and that Cheroff's ineffective assistance of counsel argument fails. *See State v. Weaver*, 198 Wn.2d 459, 466-67, 496 P.3d 1183 (2021) ("To satisfy the constitutional demands of

---

[5] The State's argument here appears to look past what Cheroff argues. Her point is that while there was agreement by defense counsel, it is that agreement that was deficient performance.

a fair trial, the jury instructions, when read as a whole, must correctly tell the jury of the applicable law, not be misleading, and permit the defendant to present his theory of the case.").

Cheroff also fails to show that counsel's performance was deficient or that she was prejudiced as a result of referring the jury back to an instruction, which stated the correct law.

Cheroff highlights *State v. Backemeyer*, 5 Wn. App. 2d 841, 428 P.3d 366 (2018), for the proposition that where a jury question reveals confusion about a legal issue critical to the defense, *counsel must take action* to ensure the jury properly understands the law. However, *Backemeyer* is distinguishable.

In *Backemeyer*, the jury asked a question regarding whether the doctrine of self-defense applied even when someone was in a place they did not have a right to be. 5 Wn. App. 2d at 847. The court answered that it should read the jury instructions. *Id*. at 847-49. However, later on, the jury posed a second question regarding the same self-defense issue, making it clear that it had not read instruction 14, which set out the law of self-defense and would have answered the jury's question. *Id.* In response to this second question, both counsel agreed that the court should respond again with the generic direction to "'[p]lease read your instructions.'" *Id*. at 847. Despite knowing that the jury was still confused on the law of self-defense, defense counsel failed to ask the trial court to instruct the jury to specifically review the self-defense instruction (instruction 14) that would have directly clarified the jury's confusion. *Id.* at 849. Therefore, this court held counsel's performance was deficient. *Id*. at 851.

Unlike *Backemeyer*, here, the jury asked if instruction 7 and its statement of "The crime" indicated that Cheroff had prior knowledge of the specific drive-by shooting crime or if it meant she had knowledge of a crime in general. CP at 52. The court responded based on discussions with both counsel, who agreed that the jury should refer back to the instructions. The jury did so

and did not ask any other question regarding the issue, implying that, upon re-reading the instructions, the jury's confusion was clarified. Therefore, unlike *Backemeyer*, counsel did not need to request any further specific clarification. As such, counsel's performance was not deficient.

Finally, if we were to adopt Cheroff's argument, it would require counsel to request a clarifying instruction whenever a jury submits a question, even when the jury instruction given at trial is accurate. Such a request in every case is not required for constitutionally effective assistance. Accordingly, counsel's performance was effective; we need not reach the issue of prejudice.

C.      Stipulation to Calculation of Offender Score and Texas Conviction

Cheroff argues that defense counsel was ineffective when they stipulated to comparability of the 2009 Texas aggravated assault offense by signing the State's statement of criminal history and orally agreeing during sentencing. Specifically, she argues that because the 2009 offense is not comparable to a Washington felony offense and the State did not present any evidence supporting a finding of factual comparability, counsel's stipulation resulted in a miscalculated offender score and sentence. Further, Cheroff argues that without the 2009 offense, several of her earlier convictions would have washed out.

The State responds that defense counsel's stipulation to the Texas conviction as a comparable offense to a Washington offense cannot be a basis for an ineffective assistance of counsel claim as the reasons for the stipulation are outside the record. We agree with the State.

Again, to prevail on an ineffective assistance of counsel claim, Cheroff bears the burden of demonstrating deficient performance and resulting prejudice. *See Stotts*, 26 Wn. App. 2d at 165.

Out-of-state convictions can be included in a defendant's offender score only if they are either legally or factually comparable to a Washington offense. *State v. Arndt*, 179 Wn. App. 373, 378-79, 320 P.3d 104 (2014). Offenses are legally comparable if the elements of the out-of-state offense are the same or narrower than the Washington statute. *State v. Olsen*, 180 Wn.2d 468, 472-73, 325 P.3d 187 (2014). Offenses are factually comparable when defendant's actual conduct underlying the out-of-state offense would have violated the Washington statute. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007).

In her reply, Cheroff relies on *Thiefault* for the proposition that an out-of-state conviction included in her offender score is not comparable because the lack of record fails to satisfy the factual comparability analysis required. However, *Thiefault* did not involve a stipulation to criminal history as we have here. *Id.* at 412-14. And *Thiefault* does not require a comparability analysis based on records of conviction for an out-of-state conviction where a criminal defendant stipulates to their criminal history. *See id.* at 415. *Thiefault* is not instructive.

Here, Cheroff cannot show prejudice resulted from the stipulation to comparability. Cheroff would have to establish that if counsel had not stipulated to the 2009 offense being comparable to a Washington offense, the State would have been unable to prove legal or factual comparability. But as previously stated, the record is insufficient to determine whether or not the 2009 Texas offense was comparable to an offense under Washington law. If there is evidence outside of the record that would bear on whether Cheroff received ineffective assistance of counsel, she is free to raise it in a personal restraint petition. *McFarland*, 127 Wn.2d at 335; *see State v. Grier*, 171 Wn.2d 17, 29, 246 P.3d 1260 (2011) ("While off-the record conversations between

Grier and her attorney may be germane to her ineffective assistance claim, Grier must file a personal restraint petition if she intends to rely on evidence outside of the trial record.").

III.  TRIAL COURT'S AUTHORITY IN CALCULATING CHEROFF'S OFFENDER SCORE

Next, Cheroff argues that the trial court exceeded its statutory authority when relying on the stipulated offender score of 9 as that score included the Texas offense committed in 2009. Pursuant to *Erlinger*, Cheroff alleges the court violated her constitutional rights[6] by considering the Texas conviction and increasing her punishment without a jury determination of the fact of conviction.[7] The 2009 offense is significant because several of Cheroff's earlier convictions would have washed out if that conviction had not been counted. The State argues the court properly considered the 2009 aggravated assault conviction from Texas and this case does not implicate *Erlinger*. We agree with the State.

"The Fifth and Sixth Amendments placed the jury at the heart of our criminal justice system." *Erlinger*, 602 U.S. at 831. The Fifth Amendment dictates that no "person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. The Sixth Amendment guarantees a criminal defendant "speedy and public trial, by an impartial jury." U.S. CONST. amend. VI. Generally, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable

---

[6] Cheroff alleges a violation of her jury trial right under both the United States and Washington Constitutions. She provides no independent argument under the Washington constitution, so we do not address this alleged violation further. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

[7] In Cheroff's supplemental reply brief regarding *Erlinger*, she writes that her trial counsel's stipulation to the criminal history was "constitutionally defective." Supp. Reply Br. of Appellant at 12. This is the first suggestion that *Erlinger* requires reversal of sentencing under an ineffective assistance of counsel claim. Parties are not permitted to raise new arguments on reply. RAP 2.5(a). Additionally, given our holding regarding inapplicability of *Erlinger*, this assertion would fail.

doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). There is, however, a narrow exception. *Id.*; *Erlinger*, 602 U.S. at 838. A sentencing court may consider "'the fact of a prior conviction'" so long as it determines only "'what crime, with what elements, the defendant was convicted of.'" *Erlinger*, 602 U.S. at 838 (quoting *Alleyne v. United States*, 570 U.S. 99, 111 n.1, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013); *Mathis v. United States*, 579 U.S. 500, 511-12, 136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016)).

A defendant cannot agree to punishment in excess of that established by the legislature. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 873-74, 50 P.3d 618 (2002). A sentence is excessive if it is based on a miscalculated offender score. *Id*. A defendant's stipulation to a miscalculated offender score generally does not waive a challenge to the miscalculated score. *Id.* at 874. However, "[w]hile waiver does not apply where the alleged sentencing error is a *legal error* leading to an excessive sentence, *waiver can be found where the alleged error involves an agreement to facts*, later disputed, or where the alleged error involves a matter of trial court discretion." *Id.* (emphasis added). A "defendant's 'failure to identify a factual dispute for the court's resolution . . . waive[s] the challenge to [their] offender score.'" *Id*. at 875 (quoting *State v. Nitsch*, 100 Wn. App. 512, 520, 997 P.2d 1000 (2000)).

Whether an out-of-state conviction is comparable to a Washington offense generally involves "both factual determinations and the exercise of discretion." *Goodwin*, 146 Wn.2d at 875. Generally, the State "bears the burden of proving the existence and comparability of a defendant's prior out-of-state and/or federal convictions." *State v. Ross*, 152 Wn.2d 220, 230, 95 P.3d 1225 (2004); *State v. Richmond*, 3 Wn. App. 2d 423, 436, 415 P.3d 1208 (2018). Nevertheless, the State may be relieved of its burden to present evidence of convictions used to calculate an offender score when a defendant *affirmatively acknowledges* the facts and information

necessary to justify inclusion of the out-of-state conviction in the offender score calculation. *Ross*, 152 Wn.2d at 230.

Here, Cheroff, in a post-consideration motion, asks us to hold that *Erlinger* requires reversal of her sentencing. *Erlinger*, issued March 27, 2024, by the United States Supreme Court, contains a thorough discussion of the limits of the "fact of conviction" exception to the jury trial right. *Erlinger*, 602 U.S. at 821, 834. The State disagrees, arguing *Erlinger* is inapplicable. We agree with the State.

*Erlinger* is inapplicable because the Court limited its holding to the "occasions inquiry" for determining prior firearm offenses under the federal Armed Career Criminals Act (ACCA). 602 U.S. at 835 ("While recognizing Mr. Erlinger was entitled to have a jury resolve ACCA's occasions inquiry unanimously and beyond a reasonable doubt, we decide no more than that."). Indeed, the Court expressed its desire to limit the breadth of the fact of conviction exception, even isolating its opinion in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), which allows judges to determine the "fact of conviction," as "'at best an exceptional departure' from 'historic practice.'" *Erlinger*, 602 U.S. at 837 (quoting *Apprendi*, 530 U.S. at 487). But in spite of its expressions, the Court did not overrule *Almendarez-Torres*. *Id.* at 838. We take the Supreme Court at its word and hold that *Erlinger* has no application here and that *Almendarez-Torres* continues to allow a judge to determine the "fact of conviction."

Further, our Supreme Court's decision in *State v. Wheeler*, 145 Wn.2d 116, 34 P.3d 799 (2001), is on point. In *Wheeler,* our supreme court concluded that "traditional factors considered by a judge in determining the appropriate sentence, such as prior criminal history, are not elements of the crime." *Id.* at 120. The court continued "[a]ll that is required by the constitution and the statute is a sentencing hearing where the trial judge decides by a preponderance of the evidence

21

whether the prior convictions exist. *Id.* at 121. *Wheeler* has not been overruled. Accordingly, a comparability analysis regarding the "fact of conviction" would continue to fall under the exception to the rule articulated in *Apprendi*. 530 U.S. at 490.

Finally, Division One of this court in *State v. Anderson* considered and rejected a similar argument based on *Erlinger*. 31 Wn. App. 2d 668, 681, 552 P.3d 803, *review denied*, 2024 WL 4986548 (2024) (*Erlinger* "is limited to resolving ACCA's occasions inquiry and does not overrule our state's well-established precedent."). We agree with the analysis in *Anderson*.

The above discussion notwithstanding, Cheroff waived her opportunity for any determination of either legal or factual comparability. Cheroff filed a sentencing memorandum noting that, "Cheroff's criminal history indicates convictions out of the state of Texas, and that Defendant *may have 9+ points* for sentencing purposes." CP at 80 (emphasis added). Her memorandum continued, "*if* Ms. Cheroff's criminal score is 9+ points, her range is 87-116 months on the Drive By Shooting conviction." CP at 80 (emphasis added). Cheroff also stipulated to her prior convictions. As a result, the trial court did not conduct a comparability determination of Cheroff's prior criminal convictions. Rather, her prior criminal convictions were provided to the court by Cheroff, via her signed stipulation to her prior criminal convictions and her sentencing memorandum. In light of the foregoing, Cheroff waived any challenge when signing the judgment and sentence instead of raising a challenge to the comparability of the Texas conviction. *Goodwin*, 146 Wn.2d at 874. The trial court did not err in including the Texas conviction in Cheroff's offender score.

IV.     COMMUNITY CUSTODY CONDITIONS

Cheroff argues that the judgment and sentence included additional conditions of community custody contrary to what the trial court stated it would impose. The State counters, arguing that the each of the conditions imposed were either mandatory or waivable under RCW 9.41.045, which will be imposed if not waived. Additionally, the State argues that Cheroff failed to preserve the argument below. We disagree with the State.

The record shows that the trial court stated that it would impose an 18-month community custody period and a "requirement of compliance with all criminal laws, but [] not imposi[tion] [of] any additional requirements as there [was] not . . . a request." RP (Oct. 18, 2022) at 22. Therefore, we remand for the trial court to strike the challenged community custody conditions.

V.      CRIME VICTIM PENALTY ASSESSMENT

Finally, Cheroff argues that given the recent statutory amendments, the trial court's imposition of the $500 CVPA should be stricken. The State does not oppose remand on this issue but nevertheless argues that at the time of sentencing the trial court did not find Cheroff indigent, so the court did not err.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the CVPA on indigent defendants as defined in RCW 10.01.160(3). *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). Although this amendment took effect after Cheroff's sentencing, it applies to cases pending on appeal. *Id.*

The State notes that the trial court did orally find Cheroff indigent for purposes of appeal. We remand for the trial court to strike the imposition of the CVPA.

CONCLUSION

We affirm Cheroff's convictions but remand for the trial court to strike the challenged community custody conditions and the CVPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Maxa, J.

_____
Lee, J.